IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **RICHARD WHITE,**<br>           **Plaintiff,** | **CIVIL ACTION** |
| v. | |
| **PUROLITE CORPORATION,**<br>           **Defendants.** | **NO.  19-1736** |

## MEMORANDUM OPINION

Defendant Purolite Corporation moves for summary judgment of Plaintiff Richard White's Section 1981 and Title VII racial discrimination, retaliation and hostile work environment, Family and Medical Leave Act ("FMLA") interference and retaliation, and Americans with Disabilities Act ("ADA") discrimination and retaliation claims.[1]  For the reasons that follow, Defendant's motion will be granted in part and denied in part.

**I.     BACKGROUND**

Purolite is a chemical manufacturing company.  White, an African American male, worked for Purolite from September 2000 until his termination on March 11, 2019.  Immediately prior to his termination, White worked in the shipping department of Purolite's warehouse and was responsible for unloading and handling materials used in Purolite's manufacturing process.  As a warehouse worker,[2] White was supervised by a warehouse manager, and the warehouse

---

[1] In his Opposition to Purolite's Motion for Summary Judgment, White does not mention his hostile work environment claims (under either Title VII or Section 1981) or his FMLA claims.  Consequently, these claims are considered waived and summary judgment will be entered in favor of Purolite. *See United States v. Healy*, 2013 WL 1624310, at *1 (M.D. Pa. Apr. 15, 2013) (citing *Nat'l RR Passenger Corp. v. Pennsylvania Pub. Util. Comm'n*, 342 F.3d 242 (3d Cir.2003)) ("[I]ssues not briefed are deemed waived.  Where a party makes no more than a single mention of the claim, the claim is consequently waived.").

[2] The parties disagree about White's exact title, so this opinion will use the generic term "warehouse worker" to describe his position.

manager was supervised by a plant director.

In January 2019, Purolite hired Phil Palmer, a Caucasian male, as its warehouse manager. Purolite's management, including plant director Warner Jarnagin, hoped Palmer would address certain inefficiencies in operations, including possible abuses of overtime by employees. Jarnagin and Human Resources ("HR") manager Karen Beck specifically identified White to Palmer as an employee potentially abusing overtime. In 2018, for example, White had increased his annual salary by about $22,000, or 50%, by working overtime and double-time.[3]

As manager, Palmer enforced Purolite's overtime policy strictly. He required pre-approval of all overtime, aimed to align overtime with business need, and discouraged use of overtime during the weekends, when the warehouse was technically closed and was unsupervised. White was unhappy about the changes, which he believed decreased his opportunity to earn overtime, and, specifically, to work his preferred weekend overtime. Throughout January and February, Palmer repeatedly emailed Jarnigan and Beck about overtime-related issues with White, claiming that White was resistant to the changes and uncooperative.

In addition to the overtime-related issues, White suffered from chronic pain arising from a 2014 motorcycle accident during these months. Beginning in October 2016, he regularly required intermittent FMLA leave to manage that pain. And, towards the end of February, shortly before his suspension and eventual termination, White requested and was approved for intermittent FMLA leave.

Then, on March 5, White approached Jarnigan and complained about what he perceived to be the unequal distribution of overtime among employees. Specifically, White stated that

---

[3] Overtime is any work above 40 hours per week; double-time typically refers to any work above a certain number of hours or days in a row.

Palmer was assigning more overtime to the "lighter-skinned," *i.e.*, Hispanic, employees than the "darker-skinned," *i.e.*, African American, employees.  White claims that, when he raised these concerns with Jarnigan, Jarnigan laughed and said "he found it hard to believe [Palmer] was racist."  At his deposition, White speculated that his termination already "was in the works" after that meeting.  Jarnigan denies laughing at White and stated at his deposition that he considered the discussion to be a complaint by White of racial discrimination.  The parties agree that the next day, March 6, Jarnigan notified Beck of White's complaint and that Beck began analyzing the warehouse employees' payroll records.

Then, on March 7, before Purolite had completed its investigation into White's claims, he again raised the overtime issue—this time, at a warehouse-wide staff meeting.  As the meeting ended, White asked Palmer, "[W]hy is it that all the people with darker colored skin, overtime is being cut compared to people with a lighter color skin[?]"  In response to White's comment, Palmer told White they needed to go immediately to HR.

At HR, Palmer and White discussed the incident with Beck and Jarnigan.  White claims that he "was treated very hostile" as soon as he arrived at HR.  White was ultimately suspended pending the completion of Purolite's investigation into White's claims.  After White's suspension, Beck interviewed all of the warehouse workers who had witnessed the incident between White and Palmer.  According to these reports, none of the other warehouse workers expressed sympathy with White or agreement with his accusations.  In addition to conducting interviews, Beck continued analyzing Purolite's timesheets to evaluate White's claims.  Following her timesheet analysis, Beck concluded that White's allegations were meritless and that White had made his accusations in bad faith.

The investigation being complete, Beck and Jarnigan decided to terminate White.  On

3

March 11, Beck called White to fire him. According to White, Beck said, "we looked into your allegations and due to you made false statements . . . Purolite is terminating your employment." Beck also sent White a termination letter which stated that White was suspended for his "disruptive, obnoxious and insubordinate behavior" during the staff meeting, and that he was terminated after Purolite determined that White's accusations were "unfounded, lacking any basis in fact whatsoever."

In April 2019, White sued Purolite. Purolite now moves for summary judgment on all claims.

## II.   STANDARD OF REVIEW

"[S]ummary judgment is appropriate where there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law." *Alabama v. North Carolina*, 560 U.S. 330, 344 (2010) (citations and internal quotations omitted). In ruling on a summary judgment motion, a court must "view the facts and draw reasonable inferences in the light most favorable to the party opposing the summary judgment." *Scott v. Harris*, 550 U.S. 372, 378 (2007) (internal quotations and alterations omitted). "A genuine issue is present when a reasonable trier of fact, viewing all of the record evidence, could rationally find in favor of the non-moving party in light of his burden of proof." *Abington Friends Sch.*, 480 F.3d at 256.

## III.   DISCUSSION

### A.  Title VII and Section 1981 Claims

Both Title VII and Section 1981 prohibit racial discrimination in the workplace, as well as retaliation for complaints of illegal discrimination, *see* 42 U.S.C. § 2000e, 42 U.S.C. § 1981; *see also Petty v. Delaware River & Bay Auth.*, 2014 WL 4446172, at *4-5 (D. Del. Sept. 8, 2014), and "the substantive elements of a claim under section 1981 are generally identical to

4

the elements of an employment discrimination claim under Title VII," *Brown v. J. Kaz, Inc.*, 581 F.3d 175, 181-82 (3d Cir. 2009).

1. **Discrimination Claim**

Where, as here,[4] there is no direct evidence of discrimination, the *McDonnell Douglas* burden shifting framework applies. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). Under this standard, the plaintiff

> bears the initial burden of establishing a prima facie case by a preponderance of the evidence. When a plaintiff establishes a prima facie case of discrimination, the burden shifts to the employer to articulate some legitimate, nondiscriminatory reason for the employee's rejection. If the defendant meets this burden, the presumption of discriminatory action raised by the prima facie case is rebutted. The plaintiff then must establish by a preponderance of the evidence that the employer's proffered reasons were merely a pretext for discrimination, and not the real motivation for the unfavorable job action.

*Sarullo v. U.S. Postal Serv.*, 352 F.3d 789, 797 (3d Cir. 2003) (internal quotations and citations omitted).

"The existence of a prima facie case of employment discrimination is a question of law that must be decided by the Court." *Id.* To establish a prima facie case, a plaintiff must show that "(1) he belongs to a protected class; (2) he[] was qualified for the position; (3) he[] was subject to an adverse employment action despite being qualified; and (4) under circumstances that raise an inference of discriminatory action, the employer continued to seek out individuals with qualifications similar to the plaintiff's to fill the position." *Id.*

To raise an inference of discrimination, plaintiffs generally rely on comparator evidence, or "evidence that defendant treated 'similarly situated' individuals not within plaintiff's protected class more favorably than it treated plaintiff." *Darby v. Temple Univ.*, 216 F. Supp.3d 535, 542 (E.D. Pa. 2016) (quoting *Wilcher v. Postmaster Gen.*, 441 F. App'x. 879, 881 (3d Cir.

---

[4] The parties agree that White has not presented direct evidence of discrimination.

5

2011)). "In assessing similarity, relevant factors include: the employees' job responsibilities, the supervisors and decision-makers, and the nature of the misconduct," which "must be of comparable seriousness." *Id.* (internal quotations, citations and alterations omitted); *see also Opsatnik v. Norfolk S. Corp.*, 335 F. App'x 220, 223 (3d Cir. 2009). Ultimately, however, which factors are relevant is within the district court's discretion and is determined case by case. *See id.* at 223. In lieu of comparator evidence, a plaintiff may also present evidence of similar racial discrimination of other employees, or direct evidence of discrimination from statements or actions by her supervisors suggesting racial animus." *Golod v. Bank of Am. Corp.*, 403 F. App'x 699, 703 n.2 (3d Cir. 2010).

Here, the parties also agree that White belongs to a protected class; that he was qualified for his position; and that his termination constituted an adverse employment action.[5] The parties disagree, however, about whether White was terminated under circumstances giving rise to an inference of discrimination. White argues that Palmer's "treat[ing White's] Hispanic colleagues more favorably regarding work assignments and in the assignment of overtime" and Purolite's "treat[ing White's] non-black colleagues, who engaged in much more egregious conduct, much more favorably than him" raises an inference of discrimination. Purolite contends that its records disprove White's claims about overtime and that the other employees White refers to were not similarly situated.

Indeed, White has not met his burden of putting forward evidence giving rise to an inference of discrimination. The undisputed timesheet evidence shows that, far from being denied overtime, White worked a significant number of overtime hours under Palmer's

---

[5] Purolite argues that White's reduction in overtime hours did not constitute an adverse employment action. However, White identifies his termination as the relevant adverse action, and Purolite does not disagree that his termination was adverse.

6

management and that he was repeatedly either unable or unwilling to work the overtime offered to him.  For example, at the end of January, Palmer approved White to work overtime on Monday mornings for the next four weeks.  However, White only appeared to work on one of these Mondays and took either personal days or FMLA leave on the others.  Then, on February 20, 2019, White informed Palmer that he could stop offering him overtime because he had gotten an additional job.  Nevertheless, White accrued 90.5 hours of overtime and 14.5 hours of double-time during from January to March 2019, making him the fourth-highest overtime earner in his department.[6]

Neither do the records suggest a racial disparity in overtime.  The second-highest overtime earner was Robert Scott, an African American, and the lowest overtime earners were Caucasian.  While the highest overtime earner, Manny Martinez, was Hispanic, Martinez occupied a different position than White (that of shipping clerk) and White admits he was not trained for Martinez's position and could not have performed his duties.  The same is true of shipping supervisor Jesus Mendoza, who tied with Scott for the second-highest number of overtime hours.

Neither is White's argument that Purolite favored non-African American employees who engaged in inappropriate conduct supported by record evidence.[7]  White identifies four ostensible comparators—J.H., T.M, C.G., and J.B., none of them were similarly situated to White.  *Opsatnik*, 335 F. App'x at 223 (outlining factors to consider in determining whether

---

[6] White also earned 14.5 hours of double time, making him the number one double time earner in his department.

[7] Neither does Purolite's conduct following White's termination raise an inference of discrimination.  White was replaced by an African American.  *See May v. PNC Bank*, 2020 WL 370043, at *7 (E.D. Pa. Jan. 22, 2020) ("Common circumstances giving rise to an inference of unlawful discrimination include the hiring of someone not in the protected class as a replacement." (internal quotations and alterations omitted)).

employees are "similarly situated"). As a threshold matter, three of these four—J.H., T.M. and C.G.—were in fact reprimanded for behaving inappropriately; J.H. and T.M. were suspended and C.G. was eventually terminated. Further, both C.G. and J.H. worked in different departments than White and reported to a different supervisor. *See id.* (identifying job responsibility and identity of supervisor as a factor is determining whether employees are similarly situated). Though T.M. did work in the same department as White, he engaged in significantly different conduct than White, telling another employee "what comes around, goes around;" White does not explain how this conduct was comparable to his own. *See Willis v. UPMC Children's Hosp. of Pittsburgh*, 808 F.3d 638, 649-50 (3d Cir. 2015) (finding employees not similarly situated where conduct dissimilar and where plaintiff did not explain how conduct was comparable). And, while J.B. was not suspended or terminated, he was a supervisor and therefore is not an appropriate comparator. *See Mandel v. M & Q Packaging Corp.*, 706 F.3d 157 (3d Cir. 2013) (explaining that employees holding "different position[s]" not similarly situated).

Because White has not put forth sufficient evidence to raise an inference of discrimination, he has failed to establish a prima facie case of discrimination. Purolite's Motion for Summary Judgment will therefore be granted as to White's discrimination claim.

### 2. Retaliation Claim

White asserts that Purolite terminated him in retaliation for complaining about alleged racial disparities in the assignment of overtime hours.

Following the Supreme Court's decision in *University of Texas Southwestern Medical Center. v. Nassar*, "Title VII retaliation claims must be proved according to traditional principles of but-for causation[.] . . . This requires proof that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer." 570 U.S.

338, 360 (2013).  Otherwise stated, the plaintiff must prove that the desire to retaliate was the "real reason" for the challenged employment action, *i.e.*, that retaliatory animus had a "determinative effect" on the adverse employment action.  *Carvalho-Grevious v. Delaware State Univ.*, 851 F.3d 249, 258 (3d Cir. 2017).

As a threshold matter, however, a plaintiff in a retaliation case "need not prove the merits of the underlying discrimination complaint, but only that he was acting under a good faith, reasonable belief that a violation existed."  *Aman v. Cort Furniture Rental Corp.*, 85 F.3d 1074, 1085 (3d Cir. 1996) (internal quotations omitted).  But where "[n]o reasonable person could have believed" that the complained-of conduct would be protected, an employee has no basis for a retaliation claim.  *Clark Cty. Sch. Dist. v. Breeden*, 532 U.S. 268, 271 (2001) (per curiam).  For example, "the law will not protect a disgruntled employee who claims he was a victim of discrimination when those allegations either are unreasonable or are in bad faith."  *Seebald v. Praxair, Inc.*, 2004 WL 350912, at *10 (E.D. Pa. Jan. 21, 2004).  That said, "if an employer chooses to fire an employee for making false or bad faith accusations, he does so at his peril, and takes the risk that a jury will later disagree with his characterization."  *Sanders v. Madison Square Garden, L.P.*, 525 F. Supp.2d 364, 367 (S.D.N.Y. 2007) (internal citation omitted).

Here, White has established, for purposes of summary judgment, that he was acting under a reasonable, good faith belief that Purolite was discriminating against him when he raised his concerns with Jarnigan and then confronted Palmer at the staff meeting; the fact that White's belief was incorrect is therefore immaterial.  *See Aman*, 85 F.3d at 1085.  At his deposition, White explained that he came to believe that Palmer was distributing overtime unequally between African American and Hispanic employees "[f]rom knowing what time I get [to work] and them [*i.e.*, the 'lighter-skinned' employees] being there and knowing what time I leave and

they're still there."  Though Purolite seeks to cast doubt on this explanation by noting that White told other employees "I'm gonna get my weekends back, you just watch" before lodging his complaint with Jarnigan, White denies this claim, and it is for a jury to judge White's credibility. *See Scott*, 550 U.S. at 378.

Having concluded that White was acting under a good faith, reasonable belief that a violation existed, the Court now considers whether White has presented sufficient evidence of retaliation.  Where a plaintiff presents direct evidence of retaliation, the familiar *McDonnell Douglas* burden shifting framework does not apply.  *See Boykins v. SEPTA*, 722 F. App'x 148, 156 (3d Cir. 2018) (citing *Fasold v. Justice*, 409 F.3d 178, 188 (3d Cir. 2005)).  "Direct evidence of [retaliation] would be evidence which, if believed, would prove the existence of the fact in issue without inference or presumption." *Torre v. Casio, Inc.*, 42 F.3d 825, 829 (3d Cir. 1994) (internal quotations and alterations omitted); *see also Naguib v. Trimark Hotel Corp.*, 903 F.3d 806, 811 (8th Cir. 2018) ("Direct evidence shows a 'specific link' between the alleged animus and the termination sufficient to support a substantially strong inference that the employer acted based upon that animus.").  Because, under *Nassar*, a plaintiff must prove that the desire to retaliate was the "but-for" cause of the challenged employment action, direct evidence in a retaliation case must be such that it establishes retaliatory animus as the real reason for the adverse action.  *See Torre*, 42 F.3d at 829.

White argues that Purolite's termination letter serves as direct evidence of retaliation.[8] Purolite's termination letter to White opens by noting that "rather than waiting" for the results of the investigation initiated by Jarnagin and Beck on March 6-7, White "publicly accuse[]d" Palmer "of assigning overtime to workers in the department based on 'the shade of their skin.'"

---

[8] Or, in the alternative, White argues that he has presented sufficient indirect evidence of retaliation to preclude summary judgment.

10

The letter then states that, a result of this behavior—which Purolite characterizes as "disruptive, obnoxious, and insubordinate"—White was "suspended." The letter also states that White had been repeatedly "disruptive to the necessary changes being made in the department" and that that disruption "culminat[ed]" with White's confrontation of Palmer. In conclusion, the letter explains that, having investigated and White's claims and determined them to be "unfounded [and] made in bad faith," Purolite was terminating him for "repeat[ing]" his allegations at the department meeting. Because a reasonable jury could, without resort to "inference or presumption," and based solely on the contents of the termination letter, *Torre*, 42 F.3d at 829, conclude that Purolite would not have terminated White "but-for" his complaint at the staff meeting, White has presented direct evidence of retaliation.

Though Purolite argues that the letter demonstrates it terminated White for the *manner* in which he made his complaint rather than for making a complaint, the fact that Purolite may have been unhappy about *both* the substance and delivery of White's complaint does not alone warrant summary judgment in its favor, since a reasonable factfinder considering the termination letter, as well as Palmer's claim that Jarnagin laughed at him when he made his initial complaint and White's contention that he had not previously been disciplined for alleged insubordination, could conclude that Purolite would not have terminated him "but-for" his decision to raise his concerns at the staff meeting, regardless of the manner in which these concerns were raised.[9]

Since White has raised a genuine issue of material fact as to whether Purolite retaliated against him, summary judgment will be denied as to White's retaliation claim.

---

[9] Furthermore, while some court have held that complaints of discrimination raised in an unreasonable manner do not constitute protected activity, *see, e.g.*, *Matima v. Celli*, 228 F.3d 68, 79 (2d Cir. 2000), Purolite identifies no case in which a court has considered a complaint unprotected merely because the employer was offended by its delivery. While Palmer, Jarnigan and Beck may have considered White's behavior "disruptive, obnoxious and insubordinate" and therefore unreasonable, "[t]he issue of reasonableness is a quintessential jury question," *United States v. Operation Rescue Nat.*, 111 F. Supp.2d 948, 955 (S.D. Ohio 1999).

11

### B. ADA Discrimination and Retaliation

The ADA prohibits discrimination in employment on the basis of a person's disability, and "[p]rohibited discrimination under the ADA includes retaliation against an employee for requesting an accommodation." *Sulima v. Tobyhanna Army Depot*, 602 F.3d 177, 188 (3d Cir. 2010). The same *McDonnell Douglas* burden shifting standard applicable to racial discrimination claims applies in the ADA discrimination and retaliation context. *See Deane v. Pocono Med. Ctr.*, 142 F.3d 138, 142 (3d Cir. 1998).

"In order to make out a prima facie case [of discrimination] under the ADA, a plaintiff must be able to establish that he or she (1) has a 'disability' (2) is a 'qualified individual' and (3) has suffered an adverse employment action because of that disability." *Id.* Similarly, "[t]o establish a prima facie case of retaliation under the ADA, a plaintiff must show: (1) protected employee activity; (2) adverse action by the employer either after or contemporaneous with the employee's protected activity; and (3) a causal connection between the employee's protected activity and the employer's adverse action." *Krouse v. Am. Sterilizer Co.*, 126 F.3d 494, 500 (3d Cir. 1997). While temporal proximity between an employer's discovery of an employee's disability or the employee's participation in protected activity and an adverse employment action may be evidence of discriminatory or retaliatory intent, the "timing . . . must be unusually suggestive of [unlawful] motive before a causal link will be inferred." *Thomas v. Town of Hammonton*, 351 F.3d 108, 114 (3d Cir. 2003). The "mere fact" that such a discovery or occurrence is followed by an adverse employment action "will ordinarily be insufficient to satisfy the plaintiff's burden of demonstrating a causal link between the two events." *Hunter v. Filip*, 514 F. App'x 206, 209 (3d Cir. 2013).

Here, the parties agree that White had a disability (*i.e.*, the chronic pain caused by his

accident); that he was qualified for his position; that he engaged in protected activity when he requested FMLA leave; and that his termination constituted an adverse employment action. However, they disagree on the issue of causation with respect to both the discrimination and retaliation claims. White argues that the timing of his termination suggests an improper motive in both instances.

With respect to his discrimination claim, he asserts that the timing of his termination was suggestive because Purolite terminated him "shortly after learning about his medical conditions and need for an accommodation." This is flatly false. White's motorcycle accident occurred in the Spring of 2014; he was approved for six months' leave immediately following the accident; and he was subsequently approved for intermittent leave beginning in 2016. White was terminated five years after his accident and three years after first requesting intermittent leave. Such timing is not "unusually suggestive" of discrimination. *Thomas*, 351 F.3d at 114; *see also Hunter*, 514 F. App'x at 209 (finding that five years between protected activity and dismissal not suggestive).

As for his retaliation claim, White argues that the timing of his termination was suggestive because he requested intermittent leave several times during the approximately two months preceding his termination. As evidence of Purolite's animus, White notes that Palmer referred to his use of leave as "problematic" in a February 20, 2019 email. But, Purolite had been granting intermittent leave since 2016 without incident, and it is uncontested that Purolite granted White all of the leave he requested. Further, when Beck received Palmer's email, she responded by "caution[ing]" Palmer against "focus[ing]" on White's use of leave and asserted White's right to use leave. She also explained that White "has a qualifying medical event . . . along with medical documentation to support it," and that she had personally approved his

request for leave, and she attached a copy of the Department of Labor's employer leave guidance for Palmer's review. Palmer then responded to this email by apologizing and promising to "re-educate" himself. Considering White's regular and uneventful use of intermittent leave for three years prior to his termination, and the occurrence of intervening events (namely, his March 5 complaint to Jarnigan and his March 7 confrontation with Palmer), *see Thomas*, 351 F.3d at 114 (finding three weeks between protected activity and termination not suggestive where other issues between the employer and employee arose during that time), the "mere fact" that White was terminated subsequent to a use of leave is "insufficient to satisfy the [his] burden of demonstrating a causal link between the two events." *Hunter*, 514 F. App'x 209.[10]

### IV. CONCLUSION

Purolite's Motion for Summary Judgment will be granted as to White's Title VII and Section 1981 hostile work environment and discrimination claims and as to his FMLA and ADA claims. Purolite's motion will be denied as to White's Title VII and Section 1981 retaliation claims.

**April 15, 2020,**　　　　　　　　　　　　　　　**BY THE COURT:**
*amended* **September 4, 2020**

　　　　　　　　　　　　　　　　　　　　　　　　**/s/Wendy Beetlestone, J.**

　　　　　　　　　　　　　　　　　　　　　　　　_____
　　　　　　　　　　　　　　　　　　　　　　　　**WENDY BEETLESTONE, J.**

---

[10] As noted in the Court's May 22, 2020 footnote Order denying reconsideration, the same analysis would apply to an FMLA retaliation claim.